UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| United States of America, | No. 2:19-cr-00235-KJM |
| Plaintiff, | ORDER |
| v. | |
| Roderick Darnell Harris, | |
| Defendant. | |

Defendant Roderick Harris has moved this court to reconsider its most recent order denying his motion to suppress. *See* Mot. Recons., ECF No. 136; Opp'n, ECF No. 138; Reply, ECF No. 139. The court granted Harris's request to the extent it held an evidentiary hearing on February 18, 2022. *See* Mot. Hr'g Mins., ECF No. 141; Evidentiary Hr'g Mins., ECF No. 152.

The court's decision turns on the answer to a simple question: Has the government met its burden to show Officer Tuss had a basis for stopping Harris for riding his bike on the sidewalk, a violation of Fairfield Municipal Code section 4.9.3? If the answer to this question is yes, Officer Tuss had probable cause to arrest and then search Harris incident to his arrest, and Harris's motion to suppress should be denied; if the answer is no, Officer Tuss arrested and searched Harris without probable cause, and Harris's motion to suppress should be granted.

This court previously credited Officer Tuss's version of events and found it "more likely than not" that Harris rode his bike on the sidewalk. *See* Order at 10, ECF No. 45. The court later

denied Harris's motion to suppress.  S*ee generally* Order, ECF No. 56.  It is this decision Harris has moved the court to reconsider.  *See generally* Mot. Recons.

As explained below, upon careful reconsideration based on the current record, the court finds the government has not met its burden of showing it is more likely than not that Harris rode his bike on the sidewalk.  The court therefore **grants** Harris's motion to suppress.

**I.      FACTUAL RECORD**

**A.      Officer Tuss's and Harris's Competing Narratives**

Harris's motion stems from events that unfolded in an area represented by the following (rough) diagram:



*Cf.* Gov.'s Ex. 6-B.  Though Harris and Officer Tuss provide different versions of those events, they acknowledge being familiar with each other before the incident in question.  *See* July 21, 2020 Evidentiary Hr'g Tr. at 124:4–7, Def.'s Ex. D (Officer Tuss acknowledging prior interactions with Harris); Feb. 18, 2022 Evidentiary Hr'g Tr. at 116:11–14, ECF No. 158 (Harris explaining past interactions with Officer Tuss prompted him to say "you guys f--- with people for no reason").  They also agree they became aware of each other's presence on the day in question while Officer Tuss was driving south on Hamilton Drive and Harris was with friends near the tree located to the west of the dirt road.  2022 Evidentiary Hr'g Tr. at 24:11–25:5, 106:7–19.  They give conflicting accounts of what happened next.

/////

/////

2

1    Officer Tuss testified as follows. He says Harris got on his bike and headed north on the
2    dirt road toward Auto Mall Parkway.[1] *Id.* at 25:10–12. Officer Tuss then made a U-turn and
3    headed north on Hamilton Drive. *Id.* at 25:19–21. When he approached Auto Mall Parkway, he
4    says he looked east and saw Harris bicycling onto the pedestrian bridge. *Id.* at 26:18–21, 27:8–
5    11, 27:21–28:1. Officer Tuss then turned right onto Auto Mall Parkway and proceeded toward
6    Harris. *Id.* at 28:1–2. He intended to make a "traffic enforcement stop." *Id.* When Officer Tuss
7    got close to the pedestrian bridge, he observed Harris standing to the east of the bridge, in the
8    approximate location marked by the red "X" on the diagram above; Harris was straddling his
9    bike. *Id.* at 28:4–9. Officer Tuss then twice instructed Harris to get off his bike and sit on the
10   curb. *Id.* at 28:22–29:7, 30:12–16. Rather than comply with Officer Tuss's directives, Harris
11   recrossed the pedestrian bridge and bicycled away from him "at an extremely fast pace" on the
12   dirt road that runs south from Auto Mall Parkway. *Id.* at 31:1–7, 52:9–13; Incident Report at 3,
13   Def.'s Ex. E. In order to intercept Harris on the dirt road, Officer Tuss made a U-turn on Auto
14   Mall Parkway, a left turn onto Hamilton Drive, and another left turn onto the access road that
15   intersects with the dirt road on which Harris was bicycling. 2022 Evidentiary Hr'g Tr. at
16   36:11–15. Officer Tuss eventually caught up with Harris on the dirt road, roughly 250 yards
17   south of the pedestrian bridge. *Id.* at 55:3–14.

18    Harris tells a very different story, as follows. He submits he did not go near Auto Mall
19   Parkway or its adjacent sidewalk. *Id.* at 113:11–17. Rather, Harris avers he had stopped to chat
20   with friends at the tree while on the way to check his crawdad traps in the creek just east of the dirt
21   road. *Id.* at 105:5–12. While Harris was at the tree, Officer Tuss drove south on Hamilton Drive
22   and yelled to Harris from his police vehicle. *Id.* at 107:2–15. Harris alerted his friends that a police
23   officer was heading in their general direction and then bicycled away, evidently at a leisurely pace,
24   /////

---

[1] Unless otherwise noted, references to Officer Tuss's testimony are to his February 18, 2022 testimony before this court.

onto the dirt road, heading south.[2] *Id.* at 107:11–24. When Officer Tuss caught up with him, Harris maintains, it was their first close interaction of the day. *Id.* at 114:2–5.

### B.      GPS Data Generally

At the evidentiary hearing, the government provided GPS data showing the location of Officer Tuss's patrol vehicle in ten-second increments. *See* Gov.'s Ex. 6-B. These data support the high-level contours of Officer Tuss's narrative: After driving south on Hamilton Drive, he made a U-turn, drove north, turned right onto Auto Mall Parkway, and passed the pedestrian bridge before telling dispatch he was making a bike stop. *Id.* It took Officer Tuss about ten seconds to pass the roughly thirty-yard pedestrian bridge.[3] *Id.* Officer Tuss then made a U-turn and proceeded along Auto Mall Parkway, onto Hamilton Drive and then the access road before turning onto the dirt road. *Id.*

On the one hand, the GPS data fit together neatly with Officer Tuss's testimony at the 2022 evidentiary hearing: Harris rode north from the tree towards Auto Mall Parkway and interacted with Officer Tuss on or near the Auto Mall Parkway sidewalk. On the other hand, the GPS data does not rule out the plausibility of Harris's testimony that he rode south from the tree after he and Officer Tuss became aware of each other's presence: Officer Tuss's GPS-confirmed movements could just as well correspond to those of an officer who sought to monitor Harris as he bicycled away. If Harris rode south on the dirt road, trees would have obscured Officer Tuss's view of him.[4] If Officer Tuss had continued south on Hamilton, his view of the dirt road would

---

[2] At a previous evidentiary hearing, Harris presented the testimony of two people with whom he interacted soon before his encounter with Officer Tuss; both witnesses testified that Harris bicycled south on the dirt road. *See* 2020 Evidentiary Hr'g Tr. at 34:19–25, 47:3–7.

[3] At various points in this order, including here, the court takes judicial notice of online distance calculations. *See United States v. Perea-Rey*, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (taking judicial notice of a Google map and satellite image as a "source[ ] whose accuracy cannot reasonably be questioned"); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1219 n. 2 (10th Cir. 2007) (taking judicial notice of online distance calculations); *cf. Boyce Motor Lines v. United States*, 342 U.S. 337, 344 (1952) ("We may, of course, take judicial notice of geography.") (Jackson, J., dissenting).

[4] In this case, where images from Google Maps and Google Earth provide the foundation for the parties' key exhibits, the court has consulted these sources in order to reconstruct a more complete picture of the relevant events. *See* Fed. R. Evid. 201(c). The court takes judicial notice of these sources subject to the parties' right "to be heard on the propriety of taking judicial notice

1  have been completely obstructed by a series of houses visible on aerial photographs.  *See id.*
2  Instead, Officer Tuss made a U-turn to drive north on Hamilton Drive and then east on Auto Mall
3  Parkway.  On that route, Officer Tuss might have caught glimpses of Harris through the trees, but
4  he would not have had a clear line of sight until after he had turned onto Auto Mall Parkway and
5  neared the pedestrian bridge.  At that point, he slowed down, told dispatch he was making a bike
6  stop, and made a U-turn at the first opportunity.[5]  The GPS data thus is not inconsistent with
7  either account of Harris's movements.
8      Of the evidence before the court, only Officer Tuss's testimony and contemporaneous
9  incident report place Harris on or near the Auto Mall Parkway sidewalk.  Because the government
10 has the burden of proving by a preponderance of the evidence that Officer Tuss saw Harris riding
11 his bicycle on the sidewalk, the court must fully accept Officer Tuss's testimony to deny
12 suppression, as it did before.  As explained below, certain gaps and inconsistencies in the record
13 now compiled diminish the court's ability to find the government has met its burden.
14      **C.      Purported Encounter at the Pedestrian Bridge**
15      Closely scrutinized, Officer Tuss's testimony regarding his alleged encounter with Harris
16 near the pedestrian bridge does not match up with the GPS data now made a part of the record.
17 Officer Tuss repeatedly testified he told dispatch Harris was "riding away from [him]" before
18 Officer Tuss made the U-turn on Auto Mall Parkway, when Harris was still supposedly on or near
19 the adjacent sidewalk.  *See, e.g.*, Incident Report at 3; Prelim. Exam. Tr. at 8:15–28, Def.'s Ex. C;
20 2020 Evidentiary Hr'g Tr. at 99:16–24, Def.'s Ex. D.  For instance, at the July 21, 2020
21 /////
22 /////

---

and the nature of the fact to be noticed."  Fed. R. Evid. 201(e); *see also Call v. Badgley*, 254 F. Supp. 3d 1051, 1061 (N.D. Cal. 2017) (taking judicial notice of street-level images from Google Maps); *Hernandez v. Caliber Bodyworks LLC*, No. 21-05836, 2022 WL 1002450, at *4 (N.D. Cal. Apr. 4, 2022) (same); *United States v. Nettles*, No. 18-1007, 2021 WL 3131658, at *5 n.9 (E.D. Mo. June 7, 2021) (sua sponte taking judicial notice of images seen in Google Maps Street View).

[5] The road adjacent to the pedestrian bridge is "narrow," as Officer Tuss testified.  2020 Evidentiary Hr'g Tr. 36:3–5.  It widens significantly to the east of the pedestrian bridge, where GPS data suggests Officer Tuss turned around.

evidentiary hearing before this court, Harris's former counsel and Officer Tuss had the following exchange:

> Q: What did you do after the defendant rode his bike across the pedestrian sidewalk and then onto the dirt path?
>
> A: I notified dispatch that Mr. Harris was riding away from me.
>
> Q: What did you do then?
>
> A: I then conducted a U-turn [on Auto Mall Parkway], went back over the pedestrian bridge, and made a left turn going southbound on Hamilton Drive.

2020 Evidentiary Hr'g Tr. at 99:16–24.

But the GPS data unambiguously show Officer Tuss was not near the pedestrian bridge when he told dispatch Harris was riding away from him. *See* Gov.'s Ex. 6-B. Rather, Officer Tuss was already turning off of the access road and onto the dirt road at that time. *Id.*; Body Cam. Footage, Def.'s Ex. G-1. When presented with this inconsistency, Officer Tuss did not provide a direct response, saying only that he was called on to provide a summary of events, not a chronology. *See, e.g.*, 2022 Evidentiary Hr'g Tr. at 38:3–20, 40:12–18, 41:8–9, 51:2–6, 68:3–10.

Officer Tuss's report of what happened could be bolstered by independent evidence, if it were available. But Officer Tuss did not activate his body camera before or while initiating the traffic stop, contrary to his department's policy. *See* Fairfield Police Department Policy Manual § 452.5, Def.'s Ex. B; 2022 Evidentiary Hr'g Tr. at 33:12–15. Nor did he notify dispatch before initially engaging Harris, which also contravenes department directives. *See* 2022 Evidentiary Hr'g Tr. at 37:19–22. Instead, Officer Tuss made his first call to dispatch moments after he says Harris ignored his directives, shooed Tuss away and began his getaway.[6] Although Harris's

---

[6] At the hearing, Officer Tuss repeatedly testified that he could not remember whether Harris rode away from him before or after he reported the bike stop, but the evidence speaks for itself. When Harris rode away from him, Officer Tuss was in the process of getting out of his vehicle. 2022 Evidentiary Hr'g Tr. at 36:19–37:4; Prelim. Hr'g Tr. at 8:6–11. In response to Harris's departure, Officer Tuss got back in his vehicle and made a U-turn. 2022 Evidentiary Hr'g Tr. at 36:11–15. That U-turn had been completed by 11:08:18, *see* Gov.'s Ex. 6-B, at which time Officer Tuss was driving west at ten miles per hour, *see* Def.'s Exs. I–K. Because Officer Tuss had reported the bike stop only four seconds earlier at 11:08:14—and because it is not plausible that Officer Tuss got back into the car, made a U-turn, and accelerated to ten miles per

6

evasion apparently served as the reason for Officer Tuss's initiating contact with dispatch, Tuss at that point relayed only that he was making a "bike stop"; he said nothing to dispatch about Harris's fleeing.

This latter observation carries weight given Officer Tuss's testimony at the 2020 evidentiary hearing. Then, he explained it is common practice for a second officer to provide cover during a bike stop in case cyclists become "combative," noting that, unlike motorists, bicyclists are not "contained" in a vehicle. 2020 Evidentiary Hr'g Tr. at 110:19–111:6. Officer Tuss's purported interaction with Harris at the bridge would bear out this rationale because Harris, without a vehicle, fled via the sidewalk after repeatedly spurning Officer Tuss's "lawful commands." *See* 2022 Evidentiary Hr'g Tr. at 29:19–24 (Officer Tuss testifying Harris "just looked at me" in response to Officer Tuss's first command that Harris sit on the curb); *id.* at 31:1–7 (Officer Tuss describing that Harris "looked at me, said something along the lines of no, waved his hand at me in a shooing motion, got back on his bicycle and rode back across [the pedestrian bridge] onto the sidewalk"). Officer Tuss, then, would have had good reason to believe cover from a second officer would be helpful if and when he ultimately apprehended Harris. But instead of alerting dispatch to the heightened need for back-up occasioned by a fleeing bicyclist, Officer Tuss simply radioed "bike stop." Though Officer Tuss told dispatch "he's riding away from me" thirty-one seconds later, *see* Gov.'s Ex. 6-B, Officer Tuss's not reporting Harris's flight earlier leaves a gap in the record that remains unexplained.

When asked why he did not activate his body camera immediately, Officer Tuss explained "[t]here was a lot going on" as he initiated contact with Harris. 2022 Evidentiary Hr'g Tr. at 35:23–24; *see also id.* at 158:9–12 (averring he did not tell dispatch Harris was riding away from him when calling in bike stop because "it happened so fast"). At that time, Officer Tuss appears to have been driving slowly on a paved road towards, in Tuss's account, a stationary Harris. *See* Def.'s Exs. I–K (showing Officer Tuss driving 5 MPH as he finished crossing the pedestrian bridge); 2022 Evidentiary Hr'g Tr. at 28:10–17 (Officer Tuss testifying that Harris was

---

hour in less than four seconds—the only realistic chronology is that Harris rode away before Officer Tuss called in the bike stop.

7

"straddling his bicycle standing up" as Tuss approached driving east). GPS data correlated with Officer Tuss's testimony show at least ten seconds passed between the time Officer Tuss decided to stop Harris and his allegedly pulling Harris over near the pedestrian bridge. *See* Gov.'s Ex. 6-B; 2022 Evidentiary Hr'g Tr. at 27:24–28:2. There is no indication that anything so distracting transpired during this interval to prevent Officer Tuss from activating his body camera in accordance with department policy. When Officer Tuss did activate his body camera, the circumstances appear to have been more complex: He had already turned off of Hamilton on to the unpaved access road and his vehicle was bouncing up and down as he cut the corner between the access road and the unpaved dirt road towards Harris, who he says was pedaling furiously. *See* Body Cam. Footage, Def.'s Ex. G-1.

Additionally, the timeline on which Officer Tuss eventually called in the bike stop, told dispatch "he's riding away from me," and activated his body camera all support Harris's insistence that he never left the dirt road. If, for example, Officer Tuss was not interacting with Harris at the pedestrian bridge but observing him from there looking south, then Officer Tuss complied with department norms by calling in the bike stop as soon as he decided to pursue Harris. He also complied with department policy by turning on his body camera when Harris became visible to him on the dirt road. And if Harris rode only south from the tree, it would make sense that Officer Tuss did not report "he's getting away from me" during their alleged encounter near the pedestrian bridge.

### D. Before Purported Bridge Encounter

There are also gaps in Officer Tuss's narrative regarding what happened before his alleged interaction with Harris at the pedestrian bridge. In describing this time period, Officer Tuss has made inconsistent statements about the direction he was driving when he first observed Harris "congregating" with friends by the tree. *Compare* Incident Report at 3 ("I was driving northbound on Hamilton drive . . . when I observed SA-Harris congregating with 1-2 individuals in [the] field[.]") *with* 2022 Evidentiary Hr'g Tr. at 25:3–5 (stating he was driving south on Hamilton "when [he] first saw [Harris]"). Officer Tuss's later testimony is consistent with the GPS data, and his testimony changed to conform to that data, whether consciously or not. The

contradiction between this explanation and the information in the Incident Report as consistent with Officer Tuss's testimony at the first hearing is not explained.

Moreover, if the court were to accept Officer Tuss's earlier statements as true, and accept his testimony that he saw Harris riding onto the sidewalk as Officer Tuss approached the intersection of Hamilton Drive and Auto Mall Parkway, GPS data suggest Harris would have had to bike approximately 110 yards from the tree to the sidewalk in nine seconds or less.[7] This would clock him at an average pace of 25 miles per hour, which common sense suggests is unlikely.

### E. After Purported Bridge Encounter

In describing what came after the supposed interaction at the bridge, Officer Tuss describes Harris's recrossing the bridge and then moving at breakneck pace: He was "standing up and pedaling extremely fast"—so fast that "his bicycle was moving side to side." 2022 Evidentiary Hr'g Tr. at 55:20–24, 54:25–55:2; *see also* Incident Report ("[Harris] was riding his bicycle at an extremely fast pace."). Officer Tuss said Harris cycled in this manner the "entire time," or for the roughly sixty seconds and 250 yards it took for Officer Tuss to catch up with Harris. 2022 Evidentiary Hr'g Tr. at 55:3–6, 55:20–24, 56:10–22. Traveling 250 yards in sixty seconds would mean Harris was traveling at this point at roughly 8.5 miles per hour, which does not appear to be consistent with Officer Tuss's description of a fast-and-furious getaway. *See* Schleinitz, K., Petzoldt, T., Franke-Bartholdt, L., Krems, J.F., & Gehlert, T., *Comparing Cycling Speed of Riders of Different E-Bikes and Conventional Bicycles* at 290–97 (2017) (observing the average off-road cycling speed for ninety study participants instructed to use their bikes normally across a four-week period was 8.4 miles per hour). And Officer Tuss's body camera footage shows Harris moments after Officer Tuss caught up with him; Harris is breathing easily and shows no signs of having exerted himself. *See* Body Cam. Footage at 0:30–0:57.

---

[7] The GPS data shows Officer Tuss was stationary at 11:07:38; he thus started driving north on Hamilton no earlier than 11:07:39. By 11:07:48, he had moved approximately 65 yards and was approaching the intersection with Auto Mall Parkway. This is where he purportedly looked to his right and saw Harris bicycling onto the pedestrian bridge.

### F.     Access to Other Side of Creek

Finally, in analyzing Harris's and Officer Tuss's conflicting versions of events in its previous order, the court credited Officer Tuss's testimony and relied on two of Harris's post-arrest statements, which the court at that time found "fatal" to Harris's story. The court explained in full:

> [D]efendant makes two admissions at 2:56 and 3:05 of Officer Tuss's body cam footage, which the court finds are critical. Arrest Footage at 2:56, 3:05. In the first instance, defendant protests, "I came out of this thing here, and I was gonna go down that side." *Id.* at 2:56. Several seconds later, defendant states, "I finna [was going to] go down that trail right there" while pointing to the other side of the creek. *Id.* at 3:05. The maps introduced by both sides at the evidentiary hearing indicate the only path defendant could have taken to access the path on the other side of the river required him to use the pedestrian bridge – the sidewalk – to cross over where Officer Tuss claims to have seen him riding his bike. Map of Incident Scene, ECF No. 23, Ex. 1. While defendant and Ms. Franklin both testified at hearing that defendant rode only south on [the dirt road] after seeing Officer Tuss's police car, this testimony does not square with defendant's statements recorded by the body cam, which are admissions fatal to his position that he never rode on the sidewalk.

Order at 9, ECF No. 45. In other words, the court's previous finding rested substantially on its understanding that Harris could have only accessed the far side of the creek by crossing the pedestrian bridge. But Harris has now submitted evidence suggesting there is an alternative way to cross the creek directly from the west without needing to use the pedestrian bridge. *See* Trail Video, Def.'s Ex. H. This new evidence also alters the record before the court so as to weaken the government's showing. The court finds its earlier inference overdrawn and no longer gives it dispositive weight.

## II.    CONCLUSION

For the reasons explained above, after careful consideration of the totality of the record, the court finds the government has not shown Harris more likely than not rode his bike on the sidewalk. Thus Officer Tuss did not have probable cause to arrest Harris and search him incident to arrest.

/////

1   Harris's motion for reconsideration is **granted** and upon reconsideration his motion to
2   suppress also is **granted**.  This resolved ECF No. 136.
3   IT IS SO ORDERED.
4   DATED: August 22, 2022.

_____
CHIEF UNITED STATES DISTRICT JUDGE
